Jesse Joe KAUFMAN, Petitioner,

v.

The PEOPLE of the State of
Colorado, Respondent.

No. 07SC70.

Supreme Court of Colorado,
En Banc.

Feb. 17, 2009.

Rehearing Denied March 16, 2009.

Law Office of Lisa Weisz, LLC, Lisa Weisz, Boulder, Colorado, Ridley, McGreevy & Weisz, P.C., Barrett T. Weisz, Denver, Colorado, Attorneys for Petitioner.

John W. Suthers, Attorney General, Cheryl Hone Canaday, Assistant Attorney General, John Fuerst III, Assistant Attorney General, Denver, Colorado, Attorneys for Respondent.

Chief Justice MULLARKEY delivered the Opinion of the Court.

## I. Introduction

We granted certiorari to review an unpublished court of appeals case to consider whether the court properly rejected alleged errors in the admission of evidence and the

jury instructions in a criminal case.[1] Jesse Joe Kaufman, the defendant, was convicted of first-degree murder, attempted second-degree murder, and a crime of violence, and was sentenced to incarceration for life without parole plus twenty years.

At the trial of this case, the court instructed the jury, as part of the instructions on Kaufman's self-defense theory, on a definition of second-degree assault that was based upon a repealed version of the statute. We find that this instruction lessened the prosecution's burden of disproving Kaufman's affirmative defense of self-defense, thus constituting plain error and requiring reversal.

In addition, we address the court of appeals' rulings on the trial court's admission of other act evidence and its provision of jury instructions on the exceptions to self-defense because these issues may arise at a new trial. We conclude that some of the other act evidence, particularly Kaufman's knife collection, was improperly admitted under CRE 404(b), prejudicing the defense by painting a picture of Kaufman as an evil individual and allowing the jury to draw impermissible inferences of action in conformity with that nature. Moreover, we find there was not sufficient evidence to support the trial court's instruction to the jury on the mutual combat exception to self-defense.

Today, we reverse the court of appeals' decision on the basis of the erroneous second-degree assault instruction, and remand with directions to return the case to the trial court for a new trial. We address the other act evidence and the jury instruction on the mutual combat exception to self-defense so as to provide guidance on retrial. We do not reach the issue of cumulative error in this case.

## II. Facts and Procedural History

Kaufman appeals his convictions for first-degree murder, section 18–3–102(1)(a), C.R.S. (2008); attempted second-degree murder, sections 18–2–101 and 18–3–103, C.R.S. (2008); and a crime of violence, section 18–1.3–406, C.R.S. (2008),[2] that stem from an altercation occurring in May 2003. While the parties presented differing accounts at trial regarding the specifics of the altercation, the parties agreed a fight occurred between two groups of people—Kaufman, his girlfriend Ursula Murray, and his friend Patrick Harrison; and Jason Kettle and his friend Christopher Walko. As a result of that fight, Kettle died of stab wounds to his liver and a puncture to his heart, and Walko suffered knife injuries to his chest and hand.

On the evening in question, Kaufman, Murray, and Harrison had drinks at two downtown Denver bars before going to the movies. They returned to the bars following the movie and continued drinking. By the time they decided to go home just before 2:00 a.m., all were fairly intoxicated. The three had driven two vehicles that evening. Kaufman and Murray were in Kaufman's pick-up truck, which was spray-painted with various designs, including a cartoon bunny, a cat, the number "23," the number "666," and the Star of David.[3] Harrison drove in a separate car.

---

1. We granted certiorari on four issues:

 (1) Whether the court of appeals erred in finding that it was harmless error to instruct the jury on a definition of second-degree assault based upon a repealed statute.

 (2) Whether the court of appeals erred in finding the trial court's admission of prejudicial evidence under CRE 404(b), without adherence to procedural prerequisites, to be harmless error.

 (3) Whether the court of appeals erred in finding the trial court's jury instructions on the exceptions to self-defense to be harmless error, at most, where the exceptions were erroneously defined and unsupported by evidence.

 (4) Whether the court of appeals erred in holding that the cumulative effect of the errors at trial did not require reversal.

2. These sections have not changed substantively since the date of the crime.

3. Kaufman alleges that these were mere artistic designs. In his brief to this court, he explained that the "23" represented basketball player Michael Jordan, and the "666" was a reference to the fact that his sixteen-year-old truck was a "beast" or "truck from hell" that frequently overheated. He stated that the Star of David was in honor of his Jewish heritage, because his father was Jewish. In contrast, the People argue that the "23" symbolized "chaos" and the "666" meant "evil."

Meanwhile, Kettle and Walko spent the evening drinking and dancing at a bar just north of downtown. When that establishment closed, they decided to continue their night at a downtown bar and dance club. They arrived downtown in Kettle's truck just as Kaufman, Murray, and Harrison were leaving.

Although the above facts are largely undisputed, the parties presented differing theories as to the details of the altercation. The prosecution's general theory of the case is as follows. As Kaufman, Murray, and Harrison were getting into their vehicles, parked on a downtown street, Kettle and Walko walked past. Walko testified that he and Kettle were laughing and commenting to each other about the spray-painted symbols on Kaufman's truck. As they walked past, Murray, an allegedly confrontational drinker, started yelling at them. Kaufman convinced her to get inside his truck, and the vehicles started to pull away. Harrison, driving with open windows, claimed to have heard Kettle and Walko refer to Kaufman as a "kike." At the time, Kaufman did not hear the remark.

At the next traffic light, Harrison drove up next to Kaufman's truck and told him about the Jewish slur he had heard. Kaufman then turned around and drove the wrong direction down a one-way street to confront Kettle and Walko. Anticipating a fist fight, Harrison followed in his own car.

According to the prosecution, Kaufman stopped his car, jumped out, and began yelling about Kettle and Walko being "Jew-haters." Harrison stopped his car behind Kaufman's truck and also got out. There was conflicting testimony as to whether Murray ever got out of the truck. Words were exchanged between all of the parties. Walko testified that Kettle approached Kaufman with his arms in the air, and that he then saw Kettle bent over with Kaufman's left hand on his shoulder. Walko claimed that he grabbed Kettle and asked Kaufman what he was doing, at which point Kaufman stabbed Walko in the hand and chest. All of the prosecution's witnesses testified that neither Kettle nor Walko had a weapon. Walko immediately drove Kettle to the hospital where he was pronounced dead as a result of his injuries. Walko was treated for his own wounds.

At trial, Kaufman presented a different version of events, relying on a theory of self-defense. He testified that upon hearing from Harrison that Kettle and Walko had used an ethnic slur, he simply wanted to ask the men why they had a problem with Jewish people.[4] Kaufman asserted that upon re-encountering Kettle and Walko, he merely asked the men why they had used the initial ethnic slur. Kettle responded by approaching Kaufman's window, stating "You're dead meat, kike." At that point, Murray got out of the truck and began yelling at Kettle and Walko. They then used an ethnic slur towards her as well.

Kaufman testified that he was fearful of the situation, and needed to defend both Murray and himself.[5] He therefore jumped out of the truck with a pocket knife as Kettle and Walko continued to advance. Kaufman stated that Kettle reached behind his back before he swung at Kaufman. Believing Kettle was reaching for a weapon, Kaufman swung at Kettle with his knife. As Walko approached Kaufman, he swung at him as well in an attempt to protect himself and Murray.

Following the fight, Kaufman, Murray and Harrison returned to their vehicles and drove to Murray's home, where Kaufman attempted to destroy evidence of the altercation.[6]

---

4. Kaufman claimed he was sensitive to the comment because his father, who was of Jewish heritage, had recently died and the altercation occurred the day after the anniversary of his father's birthday.

5. At the time, Kaufman believed Murray was pregnant with his child. Moreover, Kaufman had injured himself a few days prior to the altercation. Kaufman's hand was stitched and bandaged, with a metal brace around it, but the wound had not been sutured due to possible nerve damage requiring further care. Based on this injury and the limited use of his hand, as well as his concern for Murray's well-being, Kaufman testified that he thought defensive action was necessary.

6. Kaufman alleged that Harrison was the one who attempted to destroy the evidence of the altercation.

The following day, Kaufman fled to Florida along with Murray's roommate. Police apprehended the two men four days later. Kaufman was arrested and charged with first-degree murder, attempted first-degree murder, and a crime of violence.

At trial, the prosecution painted Kaufman as a dangerous man, fascinated with knives and martial arts, who confronted Kettle and Walko with the intent to cause "precise, deliberate, and militaristic" injury. In his own defense, Kaufman testified that he never intended to fight the two men, but was forced to defend himself in the circumstances. The jury convicted Kaufman of first-degree murder of Kettle, attempted second-degree murder of Walko, and a crime of violence.

Kaufman appealed his convictions, alleging a number of errors with regard to jury instructions, admission of evidence, witness testimony, and prosecutorial statements made during closing. The court of appeals rejected his arguments and upheld Kaufman's convictions in a unanimous, unpublished opinion, concluding that either no error existed or that if any error did exist, it did not require reversal.

We granted certiorari to review the instructional and evidentiary errors alleged by Kaufman, and we now reverse.

### III. Analysis

#### A. The Erroneous Second–Degree Assault Instruction

At trial, Kaufman's theory of the case was that he acted in self-defense against what he perceived to be an attack on him and Murray by both Kettle and Walko. Because of this theory, the jury was instructed on the use of deadly physical force as a means of defense. Under section 18–1–704(2)(a) and (c), C.R.S. (2008),[7] a person is justified in using deadly physical force to defend him or herself only if that person reasonably believes that "a lesser degree of force is inadequate," and "has reasonable ground to believe, and does believe," that either the person or a third person "is in imminent danger of being killed or of receiving great bodily injury"; or the other person is committing or reasonably appears about to commit first- or second-degree assault. The jury instruction in Kaufman's case appropriately mirrored this self-defense statute. The problem arose, however, with regard to the instruction on the definition of second-degree assault.

Instruction # 25 defined second-degree assault as either (1) acting with the intent to cause *serious bodily injury* to another, and causing serious bodily injury to any person, or (2) acting with the intent to cause bodily injury to another person and causing such injury by means of a deadly weapon. All parties agree that the first part of the instruction erroneously paralleled a standard set forth in section 18–3–203(1)(a), a statute repealed in 1994, as opposed to the current and controlling statute, section 18–3–203(1)(b), (g), C.R.S. (2008). The repealed version provided that a person commits second-degree assault if, "with intent to cause *serious bodily injury* to another person, he [or she] does cause such injury to any person." *See* ch. 121, sec. 1, § 40–3–203(1)(a), 1971 Colo. Sess. Laws, 420 (repealed 1994) (emphasis added). The relevant statute differs from the repealed version in its requisite mens rea. More specifically, under the correct statute, section 18–3–203(1)(g), a person commits second-degree assault if he or she acts with the "intent to cause *bodily injury* to another person" and causes serious bodily injury to that person or another. (emphasis added). At trial, Instruction # 25 defined second-degree assault as requiring the mens rea of intending to cause *serious* bodily injury, as opposed to bodily injury.[8]

7. In this opinion, we use the most current version of all statutes unless they have substantively changed from the time of the crime.

8. The trial court instructed the jury on the definitions of both "bodily injury" and "great bodily injury," but failed to provide any definition of "serious bodily injury." Under section 18–1–901(3)(c), C.R.S. (2008), "bodily injury" is defined as "physical pain, illness, or any impairment of physical or mental condition." "Serious bodily injury" constitutes:

> bodily injury which, either at the time of the actual injury or at a later time, involves a substantial risk of death, a substantial risk of serious permanent disfigurement, a substantial risk of protracted loss or impairment of the function of any part or organ of the body, or

Because Kaufman did not object to this erroneous instruction at trial, we review for plain error. *People v. Garcia,* 28 P.3d 340, 344 (Colo.2001); *see* Crim. P. 52(b) (plain error standard). The court of appeals determined that the error did not rise to the level of plain error, and thus did not require reversal. We disagree.

Throughout Colorado caselaw, we have frequently recognized a trial court's duty to correctly instruct a jury on the applicable law by drafting its instructions to substantially model the language of the statute at issue. *See, e.g., People v. Weinreich,* 119 P.3d 1073, 1076 (Colo.2005) (finding reversible plain error where a jury instruction paralleled an outdated version of a criminal statute and an instruction conforming to the present statute was readily available).

 Plain error is one that is "obvious and substantial and so undermine[s] the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *Id.* at 1078; *accord People v. Miller,* 113 P.3d 743, 750 (Colo. 2005). To demonstrate plain error, Kaufman must prove both that the erroneous Instruction # 25 affected a substantial right and that there exists "a reasonable possibility that the error contributed to his conviction." *Weinreich,* 119 P.3d at 1078. In cases of erroneous jury instructions, a reviewing court must consider the instructions as a whole and determine whether the jury was properly informed of the law. *Gann v. People,* 736 P.2d 37, 39 (Colo.1987).

Here, the trial court's instruction defining second-degree assault did not conform to the relevant statute. While the court of appeals recognized this error, it held that the error "could not have reasonably affected the jury verdicts." *People v. Kaufman,* No. 04CA1099, slip op. at 13, 2006 WL 3240798 (Colo.App. Oct. 19, 2006). This conclusion does not adequately take into account either the conflicting testimony at trial concerning the details of the altercation or the limitations that the instruction placed on the jury's ability to consider Kaufman's self-defense theory.

Based on the definition of second-degree assault in Instruction # 25, a jury in Kaufman's case could have concluded that Kaufman was justified in using self-defense only if it was reasonable for him to believe that Kettle and Walko intended to cause him *serious bodily injury* and would cause him serious bodily injury, or that Kettle and Walko intended to cause him bodily injury by means of a deadly weapon and would cause such injury. Under the correct version of the statute, however, a jury should have also been able to consider whether Kaufman's actions were justified if he reasonably believed that Kettle and Walko only intended to cause him *bodily injury* (i.e., physical pain), but would cause him serious bodily injury. It is this narrow possibility that the jury in Kaufman's case was precluded from considering due to the erroneous instruction. While this may appear to be a mere discrepancy in language, Kaufman argues that the particular facts of this case lend themselves to an interpretation falling within that narrow possibility. We agree, and conclude that the instructional error here may have prevented the jury from accepting Kaufman's claim of self-defense.

In analyzing the effect of the erroneous instruction, it is worth noting that under either version of the second-degree assault statute, Kaufman must have reasonably believed that Kettle and Walko were about to cause serious bodily injury to himself and/or Murray. Here, Kaufman argues that the jury could have reached this conclusion based on his testimony at trial. On direct examination, Kaufman explained that a couple of days prior to the altercation, he seriously cut his right hand and required medical attention. The emergency room doctors irrigated the wound, but did not fully suture it because of possible nerve damage that would require further care. On the night in question, Kaufman's hand was stitched, bandaged, and supported by a metal brace. He testified at trial that he is right-handed, and that because of the injury, he would not have been able to firmly grasp the knife and manipulate it dur-

---

breaks, fractures, or burns of the second or third degree.

§ 18–1–903(p).

ing the altercation as the prosecution alleged. Kaufman argues that based on this injury and the limited use of his hand, it was reasonable for him to believe that Kettle and Walko could cause him serious bodily injury in a fight, such as a fracture, even if they only intended to cause bodily injury (i.e., physical pain). In addition, he believed Murray to be pregnant at the time; thus, it would have been reasonable for him to similarly conclude that the two men could cause serious bodily injury to Murray. While Kettle and Walko may not have been aware of these vulnerabilities, Kaufman may have recognized the potential for serious bodily injury.

The discrepancy between the two versions of the statute concerns the mens rea element of second-degree assault, not the resulting injury element. Under the erroneous instruction, if the jury concluded that it was reasonable for Kaufman to believe that Kettle and Walko intended to cause only bodily injury, it would have had to reject the self-defense argument because the instruction erroneously required an intent to cause serious bodily injury. Here, the evidence may have supported a jury finding of intent to cause bodily injury. At trial, in recounting the altercation, Kaufman testified that he was worried about the safety of Murray and himself due to the physical size of Kettle and Walko, as well as the fact that both men appeared intoxicated and upset that evening. Moreover, he pointed to Kettle's threat, "You're dead meat, kike." He also emphasized that Kettle and Walko continued to advance on him, even after Harrison bluffed and told them to back away because he had a gun. While the jury may have concluded that it was not reasonable, under these facts, for Kaufman to have believed that Kettle and Walko intended to cause him *serious bodily*

*injury,* the jury might have determined, if permitted, that it was reasonable for Kaufman to believe that Kettle and Walko intended to cause him *bodily injury*.[9] Under the language of Instruction #25, however, the jury was not able to reach such a conclusion.

■ In evaluating this erroneous assault instruction in light of the other instructions provided to the jury, the court of appeals found no plain error so as to have influenced the fundamental fairness of the trial. The possible impact of the erroneous instruction, however, cannot be overlooked. Colorado law requires that once a defendant meets the burden of going forward with a claimed defense, the prosecution bears the burden of disproving the affirmative defense beyond a reasonable doubt "because a defendant's constitutional right to due process requires that the state prove beyond a reasonable doubt the facts concerning all of the elements of the offense, and a properly raised affirmative defense is treated as though it were another element of that offense." *See People v. Garcia,* 113 P.3d 775, 784 (Colo. 2005). Here, the effect of the erroneous definition in Instruction #25 was essentially to lessen the prosecution's burden, requiring the People to disprove only that it was reasonable for Kaufman to believe that Kettle and Walko intended to cause him the greater resultant injury of "serious bodily injury," and not merely that they intended to cause ordinary "bodily injury."

Moreover, the instruction significantly limited the jury's consideration of Kaufman's self-defense theory. *See People v. Vasquez,* 148 P.3d 326, 330 (Colo.App.2006) ("In restricting the jury's consideration to only the most stringent conditions under which a claim of self-defense could be established, the trial court committed prejudicial error."). Because the jury may have rejected Kauf-

---

9. The People's answer brief discusses Kaufman's argument that the jury might have concluded that while Kettle and Walko only intended to cause ordinary bodily injury, Kaufman reasonably feared that they would cause serious bodily injury due to vulnerabilities, such as his hand injury or Murray's alleged pregnancy. Rejecting this possibility, the People contend that Kaufman never argued this "complicated theory" to the jury. Moreover, in its opinion, the court of appeals stated, "The nature of the defense was straightforward, and it is highly unlikely the jury was confused or misled by the self-defense instructions." Although this may not have been Kaufman's actual theory of the case argued to the jury in closing, there was sufficient evidence presented at trial to support such a consideration. Therefore, we consider whether there exists a reasonable possibility that this erroneous instruction contributed to Kaufman's convictions.

man's self-defense claim as a result of this error, the court of appeals was incorrect in holding that the inaccurate instruction did not constitute plain error.

■ To support its ruling, the court of appeals reasoned, and the People now argue, that the focus of the self-defense inquiry is "on the reasonableness of defendant's perceptions and actions during the altercation," *Kaufman*, No. 04CA1099, slip op. at 10, thus rendering the actual intent of Kettle and Walko irrelevant. While this is a correct statement of the primary focus of self-defense law in Colorado, it fails to recognize the relevance of Kaufman's perception of Kettle and Walko's intent. "[I]n evaluating the reasonableness of the accused's belief in the necessity of defensive action," a jury is required to consider the totality of the circumstances. *Beckett v. People*, 800 P.2d 74, 78 (Colo.1990) (quoting *People v. Jones*, 675 P.2d 9, 14 (Colo.1984)); *accord People v. Darbe*, 62 P.3d 1006, 1010 (Colo.App.2002). All of the facts presented at trial, as well as Kaufman's perceptions of those facts, were relevant to the totality of the circumstances analysis in this case. Moreover, as we stressed in our opinion in *Beckett*, the jury's primary consideration is the defendant's "reasonable belief." 800 P.2d at 78 (upholding the trial court's decision not to give a separate apparent necessity instruction). There, we held that instructing a jury as to this focus encompasses the principle that " '[a]pparent necessity, if well grounded and of such a character as to appeal to a reasonable person, under like conditions and circumstances ... justifies the application of the doctrine of self-defense to the same extent as actual or real necessity.' " *Id.* at 80 (quoting *Young v. People*, 47 Colo. 352, 107 P. 274 (Colo.1910)). Indeed, the law in Colorado is settled that "reasonable belief rather than absolute certainty is the touchstone of self-defense." *Id.* (citing *People v. Jones*, 675 P.2d 9, 13 (Colo.1984)).

■ Thus, while the actual intent of Kettle and Walko was not the focus of the inquiry, Kaufman's perception of their intent was a primary consideration. As discussed above, a jury may have concluded that it was reasonable for Kaufman to perceive that Kettle and Walko intended to cause him some bodily harm, while a perception that the two men intended to cause Kaufman serious bodily injury may have been seen as unreasonable. Focusing on the defendant's reasonableness does not render a victim's apparent intent irrelevant to the totality of the circumstances analysis, particularly where the definition of the perceived crime against which a defendant is using deadly physical force contains a *mens rea* element.[10] The question is not whether Kettle and Walko actually intended to cause bodily injury, but rather whether, under the totality of the circumstances, it was reasonable for Kaufman to believe that Kettle and Walko intended to cause him bodily injury. Under erroneous Instruction # 25, the jury was prevented from considering this question as a means of justification for Kaufman's actions.

Although the trial court did instruct the jury on both the defendant's theory of the case and the prosecution's burden of disproving Kaufman's self-defense claim, its instruction defining second-degree assault based on a repealed version of the statute undermined the fundamental fairness of Kaufman's trial. Because the particular facts in this case may have supported a jury's acceptance of Kaufman's self-defense claim had it not been limited in its consideration, we hold that there exists a reasonable possibility that the error contributed to Kaufman's convictions. Finding that the erroneous instruction constitutes

---

10. Kaufman argues that ignoring the victim's *mens rea* in the context of self-defense would lead to an absurd result. For example, under section 18–1–704, C.R.S. (2008), a person may use deadly physical force as a means of defense if the person reasonably believes a lesser degree of force is inadequate and the other person reasonably appears about to commit the crime of kidnapping. Kidnapping, as defined by section 18–3–301, C.R.S. (2008), requires an "intent ... to force the victim or any other person to make any concession or give up anything of value in order to secure a release of a person." If the self-defense inquiry does not consider a victim's intent, a defendant could arguably use deadly physical force merely because the victim appeared about to perform the physical act of persuading any person to move from one place to another. The General Assembly surely could not have intended such an illogical result. We therefore reject the claim that a victim's apparent intent is irrelevant to the self-defense inquiry.

plain error, we reverse the court of appeals' decision on this ground and remand the case with directions to return it to the trial court for a new trial.

## B. Admissibility of Other Act Evidence

While our decision to remand this case for a new trial rests on the erroneous second-degree assault instruction, we elect to address Kaufman's claim regarding the admissibility of CRE 404(b) other act evidence in an effort to provide the trial court with guidance because this issue is likely to arise on retrial.[11] Kaufman challenges the trial court's admission of the following other act evidence: (1) Kaufman's ownership of brass knuckles, a machete, and eight knives other than the one used during the altercation; (2) Kaufman's training in the use of bayonets and defense against the use of knives; (3) Kaufman's training in martial arts; (4) Kaufman's training in self-defense law; (5) Kaufman's possession of reading materials on martial arts and the use of knives; (6) a drawing done by Kaufman several days following the altercation; (7) Kaufman's religious beliefs; and (8) Kaufman's alleged involvement in two prior bar fights. Although the court of appeals recognized that some of this evidence had only marginal relevance to the case, it found that, considering the case as a whole, there was no abuse of discretion by the trial court in the majority of the evidentiary rulings and no grounds for reversal of Kaufman's convictions.

The Colorado Rules of Evidence favor the admissibility of relevant evidence unless otherwise directed by constitution, statute, or rule. *See* CRE 402; *see also People v. McGraw*, 30 P.3d 835, 838 (Colo.App.2001). This principle, however, is tempered by a desire to prevent unfair prejudice that would substantially outweigh the probative value of the evidence at trial. *See* CRE 403. Of particular importance here, CRE 404(b) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

 The reasoning behind the exclusion of such evidence is three-fold. First, there is a concern that a jury will convict a defendant as a means of punishment for past deeds or merely because the jury views the defendant as undesirable. *Masters v. People*, 58 P.3d 979, 995 (Colo.2002). Second, there is a "possibility that a jury will overvalue the character evidence in assessing the guilt for the crime charged." *Id.* Third, it is unfair to require a defendant to defend not only against the crime charged, but moreover, to disprove the prior acts or explain his or her personality. *Id.*

 To prevent these improper inferences, we have established a four-part test— the *Spoto/Garner* test—for trial courts to employ when considering the admissibility of other act evidence under CRE 404(b). *People v. Garner*, 806 P.2d 366, 373–74 (Colo. 1991); *People v. Spoto*, 795 P.2d 1314, 1318 (Colo.1990). Before admitting the proffered evidence, a trial court must find (1) that it relates to a material fact; (2) that it is logically relevant, i.e., that it has a tendency to make the existence of the fact more or less probable than it would be without the evidence; (3) that its logical relevance is "independent of the intermediate inference, prohibited by CRE 404(b), that the defendant has a bad character, which would then be employed to suggest the probability that the defendant committed the crime charged"; and (4) that "the probative value of the evidence is [not] substantially outweighed by the danger of unfair prejudice." *Garner*, 806 P.2d at 373 (quoting *Spoto*, 795 P.2d at 1318). In addition, the court must determine by a preponderance of the evidence that, in light of all of the evidence before it, the other act did occur and the defendant did commit the

---

11. In doing so, we review the court of appeals' rulings as to whether these items of evidence were properly admitted by the trial court. Because we hold that reversal of Kaufman's convictions is necessary due to instructional error as discussed in part III(A) of this opinion, we do not consider whether any errors in the trial court's admissibility rulings are reversible—under either the harmless error or plain error standard.

act. *Id.* If such other act evidence is admitted, the trial court must instruct the jury on the limited purpose for which the evidence may be considered. *Id.* at 374.

■■■ In deciding issues of admissibility, a trial court has "broad discretion to determine the relevancy of evidence, its probative value and its prejudicial impact." *E–470 Pub. Highway Auth. v. 455 Co.*, 3 P.3d 18, 23 (Colo.2000); *People v. Warren*, 55 P.3d 809, 814 (Colo.App.2002). A court's decision to admit other act evidence will not be overturned unless the ruling is "manifestly arbitrary, unreasonable, or unfair." *E–470 Pub. Highway Auth.*, 3 P.3d at 23 (defining abuse of discretion). Here, Kaufman contends that the trial court abused its discretion in admitting the other act evidence listed above, and argues that the admission of such evidence allowed the prosecution to paint Kaufman as a dangerous and undesirable individual deserving punishment.

Prior to trial, Kaufman filed a request for disclosure of 404(b) evidence, asking for advance notice and a pretrial hearing on the admissibility of such evidence. Around that time, the prosecution also filed a notice of its intent to offer evidence: (1) that Kaufman was known by his friends to "always" carry a knife on his person; (2) that Kaufman was fluent in martial arts, took classes in martial arts, and took a knife class; and (3) that Kaufman possessed numerous reading materials about martial arts and knives. The prosecution argued that such evidence was admissible as *res gestae* evidence, or in the alternative, under CRE 404(b). The notice did not list a specific purpose for CRE 404(b) admissibility. Kaufman objected to the admission of evidence on these points, arguing, among other things, that the unfair prejudice would outweigh any minimal relevance and that this was merely an attempt to show action in conformity.

The trial court issued an order rejecting any claim that the evidence was admissible

as *res gestae.* Moreover, the court applied the *Spoto/Garner* test to each of the three evidentiary assertions in turn. First, it admitted evidence that Kaufman always carried a knife, finding that such evidence was logically relevant for the purpose of identifying Kaufman as the assailant who stabbed Kettle and Walko. Second, the court ruled that evidence that Kaufman was generally fluent in martial arts was not relevant, and thus was inadmissible. Evidence of specific training in knife combat, however, would be allowed because it was "relevant on the issue of whether the assailant intentionally maneuvered the knife to inflict extraordinary and grievous injury to the victim." Third, the court excluded evidence that Kaufman had in his possession general martial arts information and knife information. The court reasoned that such information could only be relevant if it specifically related to one of the permissible uses as outlined by CRE 404(b). For example, if Kaufman possessed information regarding the particular type of knife used in the altercation and its design features, such evidence might be relevant as to identity or intent.

■■ At trial, the defense objected to the prosecution's tendered limiting instruction for the knife possession and knife training because it listed multiple purposes for admissibility, failing to "articulate a precise evidential hypothesis by which a material fact can be permissibly inferred from the prior act independent of the use forbidden by CRE 404(b)," as required by *Spoto*, 795 P.2d at 1319. The prosecution argued that evidence of knife training was relevant to intent, knowledge, preparation, and absence of accident, and that evidence of knife possession was relevant to intent, motive, and opportunity. The court deleted "absence of mistake" from the list of purposes in the instruction upon the prosecution's concession of its inapplicability, but ultimately approved the rest of the tendered language.[12] In addition,

12. Kaufman challenges the limiting instruction as inadequate in preventing unfair prejudice, particularly because it expanded the possible CRE 404(b) purposes for which such evidence could be considered. While the trial court's pretrial order was narrower in its ruling as to the

possible relevant purposes of knife possession and knife training evidence, the prosecution did specify to the court its evidentiary hypothesis with regard to each of the purposes specified in the adopted instruction. In supplementing its initial order, the court adopted the proposed

the court changed the instruction from, "You are about to hear evidence about other transaction evidence," to, "You're about to hear evidence concerning the Defendant always carrying a knife and the training that the Defendant has concerning use of knives." [13] The limiting instruction was read five times during trial and was provided to the jury in the final instructions before deliberation.

In this appeal, Kaufman challenges the trial court's admission of eight categories of other act evidence, as well as the propriety of the limiting instruction. We will now address each of these admissibility challenges separately below.

### 1. Knives, Machete, and Brass Knuckles

In furtherance of the assertion that Kaufman always carried a knife on his person, the prosecution introduced evidence over the course of the trial that Kaufman possessed eight knives other than the murder weapon, a machete and brass knuckles. Most of these weapons were recovered from Kaufman's barracks room, or from his person when arrested in Florida. At trial, witnesses provided a detailed description of each of these weapons, their use and storage, and the frequency with which Kaufman carried them.[14] While questioning witnesses regarding the knives, the prosecution occasionally added commentary, such as during Kaufman's cross-examination when the prosecution asked, "Why in God's green earth would you have a knife like this?" The prosecution also emphasized this evidence in both its opening statement and its closing argument, frequently asking rhetorical questions as to why Kaufman would possess such weapons.

Kaufman argues that these weapons were completely irrelevant to the case, and thus should not have been admitted. In applying the *Spoto/Garner* test in its pretrial order on CRE 404(b) evidence, the trial court found that evidence of knife possession was admissible for the independent purpose of proving identity because such evidence suggested that Kaufman was included in the pool of potential assailants. Kaufman correctly notes, however, that identity was not at issue in this case. Here, Kaufman conceded to stabbing Kettle and Walko; he presented a theory of self-defense, thus negating any challenge to identity. The evidence therefore could not have been independently relevant to the case for that purpose.

At trial, based on the limiting instruction, the jury was allowed to consider the evidence of knife possession for the purposes of intent, motive, opportunity, preparation, or absence of accident. In its brief to this court, the People argue that the other weapons were relevant to intent because "Kaufman's experience with knives tended to show that he knew what the result would be when he plunged the knife into Kettle's abdomen and sliced upwards towards his heart." We find this reasoning to be unpersuasive, and determine that the court of appeals erred in finding no abuse of discretion with regard to the other weapon evidence.

The court of appeals held that the trial court did not abuse its discretion in admitting evidence that Kaufman always carried a knife. It did, however, question the basis for admission of Kaufman's machete and brass knuckles, particularly because Kaufman had neither of these items with him at the time of

instruction, finding a specific correlation between the other act evidence and the purposes listed in the instruction. The only purpose that the court considered too broad was that of "absence of mistake." Accordingly, it deleted this purpose from the permissible list. Viewed in combination with the analysis in its pretrial order, the trial court's limiting instruction is proper in terms of its list of permissible purposes.

**13.** Kaufman also takes issue with this change in language. In *People v. Garner*, 806 P.2d 366, 374 (Colo.1991), we stated a CRE 404(b) limiting instruction should refer to other act evidence as "transaction," "act," or "conduct," as opposed

to "offense" or "crime." Here, the court was concerned that use of the term, "other transaction" evidence would be confusing to the jury because the instruction was to be read with regard to evidence concerning knife training and Kaufman's tendency to always carry a knife. While we have preferred more neutral references to other act evidence, the court's chosen language here does not carry the same prejudicial connotation that the words "crime" and "offense" do.

**14.** On each occasion, the court provided the limiting instruction before the testimony.

the altercation.[15] This fact is true as to all of the other weapons presented, not only the brass knuckles and machete. On the night in question, Kaufman carried solely the knife used in the altercation.

This other weapons evidence does not satisfy the *Spoto/Garner* test of CRE 404(b) evidence admissibility. Specifically, the evidence fails the third prong of the test: that the "logical relevance [of the evidence] is independent of the intermediate inference, prohibited by CRE 404(b), that the defendant has a bad character, which would then be employed to suggest the probability that the defendant committed the crime charged because of the likelihood that he acted in conformity with his bad character." *Garner*, 806 P.2d at 373.

Contrary to the People's argument, the fact that a person collects knives or other weapons does not tend to make it more probable that the person is experienced with the use of knives and intends to use a knife to cause serious injury to others. During closing argument the prosecution explained how to determine what is in a person's mind, stating:

> [A] bowler knows how to bowl, that can get expertise in bowling, some one who crochets, knits, cross-stitches, someone who has a hobby, maybe with weapons. We also discussed you can consider what's in somebody's mind by their words and by

their actions. What was in this killer's mind on May 5, 2003?

A weapons collection alone has nothing to do with being able to handle knives. As an analogy, the fact that a person displays many books on a bookshelf does not necessarily mean that the person has ever read the books. Possession and use are not equivalent.

 Kaufman carried none of these other weapons on his person at the time of the accident.[16] None of them is significantly similar to the knife actually used in the altercation. Here, the prosecution was engaging in the very conduct that CRE 404(b) was designed to prevent: parading evidence before the jury merely to paint a picture of Kaufman as a bad person. On retrial, evidence of other weapons should not be admitted unless the court finds that the evidence satisfies the requirements of the *Spoto/Garner* test.[17]

## 2. Training in Knives

 The prosecution also introduced evidence that Kaufman had taken training classes in the use of knives. First, witness testimony showed that Kaufman took a three-hour self-defense class, approximately half of which was dedicated to learning novice defensive techniques against knife attacks as well as basic knife maneuvers. Harrison testified that he used to practice with Kaufman, and that such practice would require

---

15. The brass knuckles were found on Kaufman's person when he was arrested in Florida. Following a relevancy objection by the defense, the trial court allowed the prosecution to ask whether Kaufman had the brass knuckles with him on the date of the altercation. Kaufman replied that he did, and explained that he had just purchased them for a friend. Following this exchange, the court found the brass knuckles relevant because Kaufman could have potentially defended himself with them instead of using a knife. On redirect, however, Kaufman explained that he had carried the brass knuckles with him earlier on the date of the altercation, but that he had left them at Murray's house before going out that evening, and therefore, did not have them during the fight. By this point, the brass knuckles had already been admitted as evidence, and the court made no further rulings on the appropriateness of this admission in light of Kaufman's testimony.

16. A couple of weapons, including the machete, were found in the glove compartment of Kaufman's car. He did not carry these items on his person at the time of the altercation, however.

17. Kaufman urges us to approve a per se rule, as adopted by other jurisdictions, that a weapon may not be admitted into evidence unless there is proof connecting it to both the crime and the defendant. *See, e.g., People v. Tucker*, 317 Ill. App.3d 233, 250 Ill.Dec. 554, 738 N.E.2d 1023, 1030 (2000); *see also People v. Drake*, 142 Mich. App. 357, 370 N.W.2d 355, 359–60 (1985) (finding error in the admission of two other weapons not connected to the charges at issue); *People v. Freytes*, 48 A.D.2d 807, 369 N.Y.S.2d 411, 411–12 (1975) (finding error where a knife unrelated to the subject crime was admitted). We refrain from doing so today, and instead emphasize that other act evidence is only admissible if the trial court finds that it satisfies the requirements of the *Spoto/Garner* test.

one person to jab at the other with a rubber knife so that the other could practice disarming the attacker. The class instructor also testified that based on his observations at the class there was no indication that Kaufman had any prior training in knife use.

In addition to the self-defense class, the prosecution questioned Kaufman regarding his basic military training on the use of bayonets. Kaufman never received military training on knife fighting in hand-to-hand combat. The sergeant for Kaufman's military unit explained that this bayonet training was meant to familiarize soldiers with the techniques used to thrust a bayonet quickly so that it can be withdrawn and does not remain lodged in the victim, as well as techniques to defend against such thrusts. Soldiers are trained to aim for the center mass of the torso when using the bayonet.

In its pretrial order the trial court ruled that specialized training in knives was admissible under CRE 404(b) because it was relevant to determining whether "the assailant intentionally maneuvered the knife to inflict extraordinary and grievous injury to the victim." At trial, the court provided the limiting instruction before such evidence was introduced. The court of appeals found no abuse of discretion in the trial court's ruling to admit evidence of knife training.

Kaufman argues that such evidence was irrelevant because the classes merely provided basic familiarization with the techniques and did not teach how to inflict the greatest injury. Moreover, the bayonet class instructed the soldiers to aim for the upper chest, but the injuries to both Kettle and Walko were abdominal. These discrepancies, however, are not sufficient enough to deem the trial court's admission of such evidence an abuse of discretion.

We previously dealt with the admission of evidence regarding a defendant's training in knives in the similar case of *People v. Corbett*, 199 Colo. 490, 611 P.2d 965 (1980). In *Corbett*, the prosecution introduced evidence of the defendant's martial arts training involving the use of swords and knives. *Id.* at

494, 611 P.2d at 967. We held that such evidence "was relevant to show [the defendant's] familiarity with knives and ability to manipulate them, even though the evidence did not indicate that the victim had been stabbed in any unusual manner which was indicative of martial arts training." *Id.* Moreover, we found that the prejudicial effect of the evidence did not outweigh its probative value because it was not presented in an inflammatory way, there was no indication that the defendant had ever used the skills to harm anyone, and the court instructed the jury on the limited purpose for which the evidence was introduced. *Id.* at 494, 611 P.2d at 967–68.

Similarly, in this case, the testimony on the self-defense class indicated that, although basic, Kaufman had obtained some skills in knife maneuvers. Moreover, while a bayonet differs from the knife used in the altercation, the evidence suggests that Kaufman learned to quickly withdraw the weapon after stabbing, as well as to aim at a person's center of mass.[18] Thus, it relates to the material fact of whether Kaufman intended to cause Kettle and Walko such injury. In addition, the evidence was not presented in an inflammatory way, Kaufman was able to explain his limited training during his own testimony, and the court provided a limiting instruction that informed the jury that it could only consider the information for the limited purposes of intent, motive, opportunity, preparation or absence of accident. The trial court conducted the appropriate analysis of such evidence under the *Spoto/Garner* test during its pretrial order and concluded that such specialized knife training was relevant, independent of any improper inferences under CRE 404(b). We agree. Thus, the evidence of Kaufman's training in knives was properly admitted.

### 3. Martial Arts Training

■ In its initial pretrial order, the trial court excluded general testimony on Kaufman's martial arts training. At trial, howev-

18. This does not suggest that in criminal cases of those in the military, evidence of military training is always admissible. Rather, it is the partic-ular testimony in this case that makes the evidence relevant to the crimes charged.

er, the prosecution petitioned the court to allow such testimony, arguing that Kaufman opened the door to the admission of such evidence. Kaufman testified that due to the prior injury to his hand, he was not able to use his thumb and could not make a fist at the time of the altercation. The People argue that this implies that he felt the need to use a knife in defending himself because he had no other viable self-defense options. Thus, the testimony on Kaufman's training in martial arts was relevant to contradict this implication. The trial court decided to allow such evidence, and the prosecution proceeded to question Kaufman on his experience with Tai Chi, Aikido, and Kung Fu. Kaufman explained his limited exposure to these martial arts, emphasizing that he was not proficient in any of them. During closing, the prosecution recounted this martial arts training as evidence of a killer's mind.

Kaufman argues that the trial court never made the requisite findings under the *Spoto/Garner* test prior to admitting this evidence. The court of appeals held that the trial court properly excluded evidence regarding Kaufman's martial arts classes, but that to the extent such evidence came in, Kaufman was able to explain his limited training during his testimony. We now hold that evidence of Kaufman's martial arts training should not have been admitted.

 In excluding such evidence in its initial pretrial order, the trial court distinguished evidence that Kaufman was generally fluent in martial arts from evidence of specific training in knife combat, reasoning that only the latter was relevant to the issue of intent. In this case, Kaufman concedes that he stabbed Kettle and Walko with a knife. Through his testimony regarding the injury to his hand, he attempted to illustrate that he was not capable of maneuvering the knife so skillfully as to intentionally disembowel Kettle. Such testimony did not serve to open the door, however, for the prosecution to present evidence of his martial arts training. At no point did Kaufman testify that he did not have any other means of defending himself. Separate and apart from any evidence regarding knife training, Kaufman's experience in martial arts was irrele-

vant to whether he intended to cause the two victims' grievous injuries. *Cf. Corbett*, 199 Colo. at 494, 611 P.2d at 967 (finding that evidence of defendant's training in martial arts involving the use of body movements was irrelevant because the victim died of a stab wound, not of a surface blow to the body). Through the prosecution's questioning, as well as its comments in closing, Kaufman was painted as an individual well-versed in martial arts techniques. The protections of CRE 404(b) recognize that it is unfair to require a defendant to disprove prior acts or explain his or her personality. *See Masters*, 58 P.3d at 995. By admitting the irrelevant evidence of martial arts training in this case, the court required Kaufman to do just that. On retrial, evidence that Kaufman was fluent in martial arts should not be admitted.

### 4. Class on Self–Defense Law

 At trial, the defense objected to testimony by Kaufman's self-defense instructor concerning self-defense law in Colorado and the means by which such information might have been communicated to Kaufman when he was a student in the self-defense class. The prosecution sought to introduce such evidence to show Kaufman's state of mind and awareness of self-defense law. The court found a significant risk to the integrity of the jury instructions if the instructor was permitted to testify as to the law on self-defense. As a result, the court allowed the instructor solely to testify that self-defense law was part of the class, but excluded any testimony as to the substance of that information. The instructor's testimony was consistent with this ruling.

Then, on cross-examination, Kaufman testified that during the self-defense class, he was instructed as to when the use of deadly force was appropriate and when it was permissible to use force to defend himself or others. Kaufman admitted that his memory was vague as to the specifics of the course material.

On review, the court of appeals stated, "We perceive no particular relevance in the fact that defendant took a self-defense class and learned the law of self-defense." *People v. Kaufman*, No. 04CA1099, slip op. at 28

(Colo.App. Oct. 19, 2006). The court determined that this did not constitute reversible error, however, because the admission of this testimony caused no real prejudice to Kaufman. The People argue that such evidence was relevant to Kaufman's motive in stabbing Kettle and Walko, as well as to his state of mind when testifying at trial.

We agree with the court of appeals, and hold that evidence that Kaufman took a self-defense class and learned about the law of self-defense is irrelevant to the case at hand. Colorado Rules of Evidence 402 states, "Evidence which is not relevant is not admissible." Relevant evidence is defined as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401. The People argue that this self-defense law evidence is relevant to whether Kaufman had the intent to kill Kettle and Walko. This connection is tenuous at best. Because the evidence does not tend to make any of the material facts in this case more or less probable, it should not have been admitted.

### 5. Reading Materials on Martial Arts

In its pretrial order, the trial court properly excluded evidence of Kaufman's possession of general reading materials related to martial arts. The court reasoned that such information would only be relevant if it specifically related to a permissible purpose as outlined in CRE 404(b). For example, if Kaufman possessed reading materials concerning the particular type of knife used in the altercation, such information could be relevant to identity or intent.

At trial, the court admitted a Kung Fu manual into evidence, despite the defense's objection that the book would be prejudicial because Kaufman was only a novice in Kung Fu and the manual contained substantial information pertaining to expert skill levels. In addition, during cross-examination of Kaufman, the prosecution elicited testimony regarding Kaufman's tendency to read books or magazines on different philosophies of martial arts. The defense did not object to this testimony.

While the court of appeals held that the trial court properly excluded evidence regarding Kaufman's martial arts reading materials, it failed to address the consequences of these materials being admitted. Such materials were not specifically correlated to a permitted purpose under CRE 404(b). Despite the People's claim in its brief to this court, the reading materials do not tend to show motive, intent, absence of accident or mistake, preparation, or opportunity. Moreover, the court did not reconsider its prior *Spoto/Garner* analysis and reach a different conclusion before admitting the Kung Fu manual; nor did it provide a limiting instruction to the jury on such evidence. Here, the reading materials only served to further the prosecution's portrayal of Kaufman as an evil and dangerous individual trained to kill. This inference is not permissible under CRE 404(b); thus, the martial arts reading materials should be excluded upon retrial.

### 6. Newspaper Drawing

Upon apprehending Kaufman in Florida, police recovered a newspaper from the car in which Kaufman fled. In the margins of several newspaper pages, Kaufman had written the name, "Christopher Walker," many times. In addition, Kaufman had also drawn a surgical scar on the bare stomach of a woman in an advertisement. Next to the drawing, he wrote, "KILL MOR" [sic].

The court admitted the newspaper as evidence at trial. The prosecution asked Kaufman whether he had previously told Harrison, before fleeing to Florida, that he might have to get rid of witnesses, such as Murray. Kaufman denied making the statement. The prosecution, however, used the newspaper drawing of the surgical scar with the words "KILL MOR" to suggest that this had been a reference to Kaufman's intent to further cover up the crimes by killing Murray. Kaufman denied this connection and explained that the drawing was merely a "doodle." Similarly, Kaufman denied that he wrote the name, "Christopher Walker," in reference to the victim, Christopher Walko. Instead, he claimed that he had a friend named "Chris Wall," and that he had practiced signing a derivative of this name on the

newspaper in case he was stopped by police and needed a false identity.[19]

■■■ The trial court admitted the newspaper drawing as evidence of Kaufman's state of mind, rejecting the defense's claim that the drawing's prejudicial effect outweighed any possible probative value. The court of appeals concluded, without discussion, that the trial court did not abuse its discretion in admitting the drawing. We disagree.

We previously considered whether it was proper to admit a defendant's violent drawings into evidence under CRE 404(b) in the *Masters* case. *See* 58 P.3d at 994–1004. There, we applied the *Spoto/Garner* analysis and upheld the admission of more than 1000 pages of drawings. *Id.* In doing so, we held that the drawings were logically relevant to the purposes of motivation, deliberation, preparation, planning, opportunity, or guilty knowledge, all of which were independent of the prohibited action-in-conformity inference. *Id.* at 996. We emphasized that " '[t]he third prong of the *Spoto* test does not demand the absence of the inference but merely requires that the proffered evidence be logically relevant independent of that inference.' " *Id.* at 998 n. 4 (quoting *People v. Snyder*, 874 P.2d 1076, 1080 (Colo.1994)). Then, in analyzing the CRE 403 prong of the *Spoto/Garner* test, we balanced a number of factors, including:

> the importance of the fact of consequence for which the evidence is offered, the strength and length of the chain of inferences necessary to establish the fact of consequence, the availability of alternative means of proof, whether the fact of consequence for which the evidence is offered is being disputed, and, if appropriate, the potential effectiveness of a limiting instruction in the event of admission.

*Id.* at 1001 (quoting *Vialpando v. People*, 727 P.2d 1090, 1096 (Colo.1986)). Ultimately, we determined that the "substantial probative worth" of the majority of the drawings in

*Masters* was not outweighed by "the potential for unfair prejudice." *Id.*

Applying a similar analysis to the case at hand, we cannot reach the same conclusion with regard to Kaufman's newspaper drawing. The probative value of the drawings is low, particularly regarding the prosecution's proffered purpose of using the evidence to show Kaufman's state of mind. Kaufman made the drawing approximately four days after the altercation; thus, it is hard to argue that this evidence shows Kaufman's state of mind at the time of the stabbing. Moreover, the drawing of the surgical scar is not significantly similar to the crimes in this case. By introducing this evidence, the prosecution was attempting to create a chain of inferences: the drawings/writings relate to Kaufman's alleged comment to Harrison that he may need to kill the witnesses, which then relates to Kaufman's intent to kill Kettle and Walko, arguably negating his theory of self-defense. This tenuous connection, however, is outweighed by the substantial prejudicial effect of the drawing. From the drawing, the jury was free to conclude that Kaufman was an evil individual, eager to kill again and dangerous to the community at large.

Perhaps most significantly, there was no limiting instruction informing the jury of its duty to consider the drawing solely for the purpose of showing Kaufman's state of mind. In *Garner*, we specifically stated that such an instruction is necessary to prevent the jury from reaching impermissible inferences under CRE 404(b). 806 P.2d at 374. While this alone is not determinative in the analysis,[20] the prejudicial effect is that much more significant without any limitation on the jury's consideration of the evidence. Because the potential prejudicial effect of Kaufman's drawing outweighed its probative value, the trial court abused its discretion by admitting the evidence.

---

19. Kaufman states in his reply brief to this court that the police initially withheld Walko's name and that he was not aware of the name at the time he made the drawing. He asserts that any similarity between the name written on the newspaper and "Christopher Walko" was mere coincidence.

20. In *Masters v. People,* 58 P.3d 979, 1002 (Colo. 2002), we upheld the admission of the defendant's drawings into evidence despite the lack of a limiting instruction, where defense counsel did not request an instruction when the evidence was first introduced and later refused the court's offered instruction at the close of the evidence.

### 7. Kaufman's Religious Beliefs

Kaufman's Jewish heritage was prevalent among the facts surrounding this case. The Jewish Star of David painted on Kaufman's truck allegedly sparked the initial remarks from Kettle and Walko. The slurs used by Kettle and Walko, particularly the reference to Kaufman as a "kike," then escalated the situation. Moreover, in its theory of the case, the defense argued that Kaufman's father was Jewish and that he was particularly sensitive to the slurs because his father had recently died and the altercation occurred the day after the anniversary of his father's birthday. Both parties made comments regarding Kaufman's Jewish heritage in their opening statements. During her testimony, Murray confirmed that Kaufman was Jewish, but stated that he did not practice his faith. Later, when the prosecution asked Kaufman on cross-examination about the "666" symbol on his truck as a possible sign of the beast or the devil in the Bible, he responded, "I'm not very religious." The prosecution then asked further questions regarding Kaufman's religious practices. In its closing argument, the prosecution relied on this evidence in stating that Kaufman was not a very religious man.

Although he did not object at trial, Kaufman takes issue with the admission of evidence regarding his religious beliefs, arguing that such evidence was irrelevant, inflammatory, implied bad character, and was not tempered by any limiting instruction. The court of appeals held that while evidence of a defendant's religion is generally disallowed, there was no abuse of discretion in this case because the evidence came through Kaufman's own testimony.

We find no error in the trial court's admission of this testimony. Section 13–90–110, C.R.S. (2008), prohibits the questioning of a witness with regard to his religious beliefs. This statute, however, relates primarily to witness competency and credibility. Where a witness's religious opinions are relevant to other issues in the case, separate and apart from concerns of credibility, questioning on the witness's beliefs is appropriate. *Cf. Conrad v. City & County of Denver*, 656 P.2d 662, 676 (Colo.1982) (finding no violation of CRE 610 based on questioning regarding a witness's religious beliefs). In the current case, the prosecution inquired into Kaufman's religious practices in an effort to counter his claim that he was highly provoked by the Jewish slurs. Kaufman argues that he was offended by the slurs due to his Jewish heritage, not due to his beliefs regarding the Jewish religion. The prosecution's questioning, however, was relevant to determining the degree of Kaufman's sensitivity, as well as the reasonableness of his response. We hold that in light of the facts and Kaufman's own theory of the case, the admission of evidence regarding Kaufman's religious beliefs was not an abuse of discretion.

### 8. Prior Bar Fights

Finally, Kaufman challenges the admission of evidence regarding his alleged involvement in two prior bar fights. On cross-examination, the prosecution asked Kaufman if he and Harrison had been involved with other individuals in two previous bar fights. He responded that he only remembered one fight. Through further questioning, Kaufman explained that in that fight, he was escorted out of the bar, but no one had been injured. The prosecution then recounted the second alleged fight, but again, Kaufman denied any recollection of the incident. On rebuttal, Kaufman explained that the one fight was merely a wrestling match and did not involve any weapons. He also stated that he had never injured anyone in a fight prior to the altercation in this case. Kaufman did not object to this evidence at trial.

The court of appeals recognized that the bar fight evidence should not have been admitted because the fights "were not similar to the charged offenses and did not result in an arrest or conviction." *See Kaufman*, No. 04CA1099, slip op. at 29. Based on Kaufman's testimony that he had never harmed anyone in any fight before, the court found no significant prejudice to Kaufman from the admission of this evidence.

Here, the two alleged fights were entirely unrelated to the facts of this case. The evidence served no purpose but to paint

Kaufman as an individual with a proclivity to fight, particularly in light of the substantial quantity of other act evidence already admitted. The trial court did not seem to consider the evidence under the *Spoto/Garner* test before admitting it. The prosecution offered no specific evidentiary hypothesis with regard to the introduction of such evidence. Moreover, no limiting instruction was provided.

On retrial, evidence of Kaufman's alleged involvement in two prior bar fights should not be admitted.

## C. Jury Instruction on Mutual Combat Exception to Self-Defense

■ Just as we considered the admissibility of other act evidence so as to provide guidance to the court on retrial, we now address whether there was sufficient evidence at trial to support the trial court's provision of a jury instruction on the mutual combat exception to self-defense. The court of appeals found that the trial court erred in giving the instruction, but determined that the error did not prejudice Kaufman and thus did not require reversal. Based on the facts of this case as presented at trial, we agree with the court of appeals that there was not sufficient evidence to support such an instruction.[21]

■ Colorado law requires a trial court "to correctly instruct the jury on all matters of law for which there is sufficient evidence to support giving instructions." *Cassels v. People*, 92 P.3d 951, 955 (Colo.2004). At trial, Kaufman objected to the provision of an instruction on the mutual combat exception to self-defense, arguing that it was inapplicable based on the facts presented. He now argues that by giving this instruction, the trial court denied him his right to a determination beyond a reasonable doubt as to whether he acted in self-defense.

Under section 18–1–704(3)(c), C.R.S. (2008), a person is not justified in using self-defense if "[t]he physical force involved is the product of a combat by agreement not specifically authorized by law." Nowhere in the statute does the General Assembly define "combat by agreement." Rather, the elements of this self-defense exception have been developed through case law.

In *Eckhardt v. People*, 126 Colo. 18, 25, 247 P.2d 673, 676 (1952), this court held that in order to establish mutual combat, the prosecution must prove that an agreement to fight existed between the parties, and that the parties entered into the agreement before beginning combat. *See also People v. Cuevas*, 740 P.2d 25, 26 (Colo.App.1987). This court determined that mutual combat does not exist purely because the parties were mutually engaged in a fist fight. *Eckhardt*, 126 Colo. at 25, 247 P.2d at 676. In *Eckhardt*, the victim initially attacked the defendant in the bathroom of a pool hall. *See id.* at 20, 247 P.2d at 674. An argument ensued with the victim threatening the defendant and both men pushing each other. *Id.* The bartender instructed the men to take their fight outside. *Id.* Then, the victim said, "Let's go outside," to the defendant and both individuals took off their coats. *Id.* Once outside, the victim first swung at the defendant. *Id.* The defendant then struck the victim two times, causing the victim's death. *Id.*

Considering these facts, the court determined that there was no "clear-cut agreement" to fight. *Id.* at 25, 247 P.2d at 676. While there was some indication of an agreement based on the fact that both men took off their coats and went outside, the court held that "there must be a more definite agreement" when the circumstances indicate a general follow-up of an initial aggression. *Id.*, 247 P.2d at 677.

The facts of *Eckhardt* are distinguishable from other Colorado cases where courts have found the elements of mutual combat to exist. For example, as early as 1899, this court

---

21. As was the case with the admissibility of other act evidence, because we hold that reversal of Kaufman's convictions is necessary due to the erroneous second-degree assault instruction discussed in part III(A) of this opinion, we consider the issue of the mutual combat instruction purely in an attempt to provide guidance to the court upon retrial. We do not address whether the error in providing the mutual combat instruction was sufficiently prejudicial to require reversal under the harmless error standard.

recognized a mutual combat limitation on self-defense where the defendant applied an "opprobrious epithet" to the victim, invited the victim to come outside so that he could "show him what was the matter," and the victim followed the defendant out of the saloon. *Moore v. People*, 26 Colo. 213, 218–19, 57 P. 857, 858–59 (1899). Similarly, in the case of *Cuevas*, the court of appeals held there was sufficient evidence to support a mutual combat instruction where a fight arose between two gangs known to have a history of violent altercations. 740 P.2d at 26. The *Cuevas* court found an implied agreement to fight where the victim's gang sought out the defendant's gang with the intent to fight, ultimately approached the defendant's group armed with various weapons, and shots were exchanged between the two gangs.

Here, the facts presented do not indicate a clear-cut agreement to fight. Unlike in *Cuevas*, Kettle and Kaufman did not have a history of previous altercations; there was no general intent to engage in conflict. Moreover, there was no clear invitation to fight followed by an acceptance, verbal or otherwise, as was the case in *Moore*. In the current case, this was a "general follow-up of aggression," similar to that found in *Eckhardt*. The evidence shows that Kettle and Kaufman engaged in a verbal exchange, approached each other, and a fight ensued. The initial act of aggression occurred before any possible agreement to fight could have been inferred. In fact, at trial, both Walko and Kaufman testified that they had no intentions to fight. The prosecution even conceded that there was no "agreement per se."

 Colorado case law makes clear that there must be a definite agreement before a court can instruct a jury on the mutual combat limitation on self-defense. Because an agreement did not exist in this case, it was error for the trial court to provide the instruction. During deliberations, it is possible that the jury may have wondered why it was given the instruction, decided that it must have been for some purpose, and forced the evidence to fit the instruction, thereby denying Kaufman his claim to self-defense. On retrial, unless a clear agreement to fight can be gleaned from the facts presented, the court should not instruct the jury on the mutual combat exception to self-defense.

### D. Other Issues Raised

In his briefs to this court, Kaufman alleges several other errors regarding the trial court's provision of jury instructions on the exceptions to self-defense. Moreover, Kaufman argues that the court of appeals erred in holding that the cumulative effect of all of the errors at trial did not require reversal. We refrain from addressing these issues in this opinion.

### IV. Conclusion

Today, we find that the trial court erred in instructing the jury on the definition of second-degree assault based upon a repealed version of the relevant statute. We hold that this instruction lessened the prosecution's burden of disproving Kaufman's claim of self-defense, thus constituting plain error and requiring reversal. To provide guidance on retrial, we conclude that the trial court abused its discretion in admitting evidence of Kaufman's possession of other weapons, Kaufman's training in martial arts, Kaufman's training in self-defense law, Kaufman's possession of martial arts reading materials, a newspaper drawing, and Kaufman's involvement in prior bar fights. Such evidence merely served to paint Kaufman as someone with bad character and allowed the jury to convict him on the basis of action in conformity, thereby violating the tenets of CRE 404(b). In addition, we find that there was not sufficient evidence to support the trial court in instructing the jury on the mutual combat exception to self-defense. Accordingly, we reverse the court of appeals' decision and remand the case with instructions to return it to the trial court for a new trial.

Justice COATS dissents, and Justice EID joins in the dissent.

Justice COATS, dissenting.

Unlike the majority, I believe the unobjected-to, one-word error in the assault instruction given below was neither obvious nor substantial, and I would therefore find

that it could not amount to plain error. In addition, I disagree with much of the majority's evidentiary analysis and consider it misguided. The reversal of this murder conviction appears to me to result less from errors of law and more from this court's interference in matters properly reserved to the trial court and the jury. I therefore respectfully dissent.

With regard to trial error that is not brought to the court's attention by contemporaneous objection, reversal of a subsequent conviction is justified only if the error was both obvious, such that the court should have noticed it anyway, and serious enough to undermine the fundamental fairness of the trial and cast doubt on the reliability of the conviction. *See People v. Miller*, 113 P.3d 743, 750 (Colo.2005). In this case, the offending instruction enumerated the elements of the crime of second degree assault and was given, not because the defendant was charged with second degree assault, but because one of the statutory justifications for using deadly force in self-defense is acting upon a reasonable belief that another appears about to commit second degree assault and that using a lesser degree of force in self-defense will be inadequate. § 18–1–704(2)(a) and (c), C.R.S. (2008).

The trial court instructed the jury about the crime of second degree assault in order to give them a basis for assessing whether the defendant believed the victim was about to commit that crime and whether such a belief, if he really entertained it, would have been reasonable. The court correctly notified them that second degree assault required the commission of serious bodily injury to another, but it erroneously informed them that the offense also required an intent to cause *serious* bodily injury, rather than merely bodily injury, which the statute actually requires. *See* § 18–3–203(1)(b), C.R.S. (2008). As applicable to the circumstances of this case, this error therefore erroneously required the jury to reject the defendant's theory of self-defense if it found that he did not believe the victim intended to act in a manner involving at least a substantial risk of breaks or fractures.

The majority's explanation how there could be a reasonable likelihood that the jury's rejection of the defense might have been impacted by this slip seems to me so contrived as to be unworthy of serious credit. I do not consider it a reasonable possibility that a jury, which could not find a reasonable belief that the victim intended to cause serious bodily injury, would find it, nevertheless, reasonably necessary to stab the victim to prevent him from *unintentionally* causing serious bodily injury. The scenario offered by the majority presumes of the jury the kind of mind-numbing distinctions and parsing of legal definitions that would be difficult for most trained lawyers.

Moreover, I do not consider the failure of either counsel to catch the inclusion of this single word, which had earlier been excised from the definition of second degree assault, *see* ch. 287, sec. 8, § 18–3–203(1)(a), 1994 Colo. Sess. Laws 1717, to be an obvious mistake, which effectively required no objection. If, as the majority postulates, the entire defense theory hinged on the defendant's belief that the victim was likely to cause far greater injury than even he intended, it would not be unreasonable to assume defense counsel had the self-defense instructions foremost in his mind. The error was, of course, not sufficiently obvious to be caught by defense counsel, even with this motivation.

Finally, I disagree with the majority's criticism of the trial court's decision to admit evidence of the defendant's near-obsession with self-defense and several of his later markings. With regard to the former, I think the majority's analysis under CRE 404(b) misses the mark. The vast majority of the evidence complained of suggested nothing about other crimes or wrongful acts, which might be indicative of a bad or criminal character. The possession of knives and the study of self-defense did not reveal a criminal character or any revolting prior conduct that might cause a jury to punish the defendant for a murder they did not believe he committed. Quite the contrary, to the extent this evidence was likely to influence the jury at all, it could do so only by demonstrating the defendant's abnormal concern

**564**

for protecting himself from attack, a predisposition extremely probative of the unreasonableness of his subjective perceptions. Evidence is considered probative, not *unfairly* prejudicial, if it harms the defendant only by disproving a required condition of an affirmative defense.

With regard to the defendant's later doodling, I consider that to be a matter properly left for the jury. To the extent that these scrawlings could be understood by reasonable jurors as references to the charged offenses, as the prosecution has always maintained, they were relevant, subject to the jury's resolution of that fact. Our rules of evidence require the admission, rather than exclusion, of evidence when its relevance is contingent upon the fulfillment of a condition of fact, as long as there is sufficient evidence from which reasonable jurors could find that condition. *See* CRE 104(b) (Preliminary Questions: Relevancy conditioned on fact). While not conclusive one way or the other, there was unquestionably sufficient evidence in this case to convince the jury that the defendant's doodlings were references to the victim and witness in this case, rather than something else that might be unfairly prejudicial.

As we have made clear on numerous occasions, questions of relevance are peculiarly within the discretion of the trial court and are subject to review only by assuming the maximum probative value and the minimum prejudicial effect possible. *See, e.g., People v. Rath*, 44 P.3d 1033, 1043–44 (Colo.2002). Similarly, we have often made clear that a criminal conviction will not be reversed for error alone, but only if the error casts serious doubt on the fairness of the trial and the reliability of the conviction. *See Miller*, 113 P.3d at 750. I believe the majority's decision to reverse the defendant's convictions and its orders for retrial unjustifiably infringe on the prerogatives of the trial court and the jury.

I therefore respectfully dissent.

I am authorized to state that Justice EID joins in this dissent.