22CA1903 Peo v Hicks 02-27-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA1903
Boulder County District Court No. 21CR266
Honorable Nancy W. Salomone, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Robert William Hicks,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE YUN
Harris and Martinez*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 27, 2025

Philip J. Weiser, Attorney General, Josiah Beamish, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Eric A. Samler, Alternate Defense Counsel, Hollis A. Whitson, Alternate
Defense Counsel, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1    Robert William Hicks appeals the judgment of conviction entered on jury verdicts finding him guilty of second degree murder and third degree assault.  He contends that the district court erred by (1) failing to appropriately instruct the jury on self-defense; (2) limiting his questioning of a witness; and (3) denying his motion to suppress testimony regarding statements he made and observations of his demeanor while he was in police custody.  We reject those contentions and affirm the conviction.

## I.    Background

¶ 2    On February 14, 2021, Hicks and his roommate (the victim) met up with another friend to celebrate the friend's birthday.  That afternoon, while the three were driving to a restaurant to get something to eat, Hicks and the victim got into a fistfight.  According to the friend's testimony at trial, the victim ended up with swollen eyes, a bloody nose, bloody lips, and swollen cheeks after being "hit about 20 times."  After the three returned to the apartment Hicks and the victim shared, the friend went home, leaving Hicks and the victim alone.

¶ 3    Approximately forty-five minutes later, Hicks called 911 and told the operator that the victim was having trouble breathing, had

1

"some sort of trauma to his stomach," and needed paramedics. Hicks said that he did not know what happened and "had no idea" what had caused the victim's condition.

¶ 4    When the police arrived, one of the two responding officers found the victim unconscious in his bedroom. The victim was transported to the hospital, where he was pronounced dead. A forensic pathologist testified at trial that the victim had suffered eleven stab wounds spanning from his mid-thigh to his chest, one of which "injured the left iliac artery and the left iliac vein," leading to a "quick mass of blood loss." The pathologist testified that a person would have lost consciousness "within seconds" after sustaining such wounds.

¶ 5    The other responding officer stayed with Hicks in the living room area. Hicks told the officer that the victim "possibly fell on something sharp and . . . possibly did something to his own health." Approximately ten minutes later, the officer placed Hicks in handcuffs and moved him into the hallway outside the apartment door. Hicks was subsequently taken to the police station and placed in an interview room. At no point that evening did the police

advise him of his rights under *Miranda v. Arizona,* 384 U.S. 436 (1966).

¶ 6     The People charged Hicks with third degree assault for the fistfight and first degree murder for the stabbing.  Hicks testified at trial that he stabbed the victim in self-defense.  Specifically, he testified that he was eating dinner in the kitchen when the victim approached him, "holding a knife in his right [hand] down by his waist," and grabbed his head.  Fearing for his life, Hicks "started jabbing and poking at [the victim] repeatedly with the knife that [he] had" been using to eat.  After Hicks stabbed him, the victim retreated to his bedroom.  The prosecution's theory of the case was that the physical evidence did not support Hicks's testimony that the fight started in the kitchen.  Rather, the evidence showed that Hicks attacked the victim in his bedroom, where the police later found him unconscious.

¶ 7     The jury found Hicks guilty of third degree assault and second degree murder, and the district court sentenced him to thirty-six years in prison.

¶ 8     Hicks now appeals.

## II.     Self-Defense Instruction

¶ 9      Hicks contends that the district court reversibly erred by refusing to instruct the jury on his right to use deadly force to repel a second degree assault and by failing to provide a definition of "great bodily injury."  We are not persuaded.

### A.     Standard of Review

¶ 10     "We review jury instructions de novo to determine whether the instructions accurately informed the jury of the governing law," considering "all of the instructions given by the trial court together to determine whether they properly advised the jury."  *Roberts v. People*, 2017 CO 76, ¶ 18.  But we review a district court's decision to give, or not give, a particular jury instruction for an abuse of discretion.  *People v. Jones*, 2023 COA 104, ¶ 16.  "An abuse of discretion occurs when a trial court's ruling is manifestly arbitrary, unreasonable, or unfair, or contrary to law."  *People v. Van Meter*, 2018 COA 13, ¶ 9.

¶ 11     "[W]hen the evidence presented properly raises the issue of an affirmative defense, the affirmative defense effectively becomes an additional element of the charged offense . . . ."  *Roberts*, ¶ 22.  If a district court fails to properly instruct the jury on an affirmative

4

defense, "then the prosecution's burden of proof has been impermissibly lowered, implicating a defendant's constitutional rights." *Pearson v. People*, 2022 CO 4, ¶ 16. "Such an error, if preserved, is subject to constitutional harmless error review." *Id.* A constitutional error requires reversal unless it was harmless beyond a reasonable doubt. *Hagos v. People*, 2012 CO 63, ¶ 11. Under this standard, we must reverse if there is any reasonable possibility that the error might have contributed to the conviction. *Id.*

### B.    Governing Law

¶ 12    "[A] person is justified in using physical force upon another person in order to defend himself" from what "he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force which he reasonably believes to be necessary for that purpose." § 18-1-704(1), C.R.S. 2024. "Deadly physical force may be used only if a person reasonably believes a lesser degree of force is inadequate" and, as relevant here, either (1) "[t]he actor has reasonable ground to believe, and does believe, that he . . . is in imminent danger of being killed or of receiving great bodily injury,"

5

or (2) "[t]he other person is committing or reasonably appears about to commit" first or second degree assault. § 18-1-704(2)(a), (c).

¶ 13    "Great bodily injury," which is not statutorily defined, means the same thing as "serious bodily injury," which is statutorily defined. *People v. Reed*, 695 P.2d 806, 808 (Colo. App. 1984) ("[T]here is no rational basis for distinguishing between 'great' and 'serious' as applied to bodily injury."). At the time of Hicks's trial, "serious bodily injury" was defined as

> bodily injury which, either at the time of the actual injury or at a later time, involves a substantial risk of death, a substantial risk of serious permanent disfigurement, a substantial risk of protracted loss or impairment of the function of any part or organ of the body, or breaks, fractures, or burns of the second or third degree.

§ 18-1-901(3)(p), C.R.S. 2022.[1]

¶ 14    As relevant here, a person commits first degree assault if, "[w]ith intent to cause serious bodily injury to another person, he causes serious bodily injury to any person by means of a deadly weapon." § 18-3-202(1)(a), C.R.S. 2024.

---

[1] The definition has since been updated to clarify that "a penetrating knife . . . wound" constitutes serious bodily injury. § 18-1-901(3)(p), C.R.S. 2024.

6

¶ 15    Again as relevant here, a person commits second degree assault if,

> (b) [w]ith intent to cause bodily injury to another person, he . . . causes such injury to any person by means of a deadly weapon; or
>
> . . . .
>
> (d) [h]e recklessly causes serious bodily injury to another person by means of a deadly weapon.

§ 18-3-203(1)(b), (d), C.R.S. 2024.

¶ 16    "Bodily injury" means "physical pain, illness, or any impairment of physical or mental condition." § 18-1-901(3)(c), C.R.S. 2024.

## C.    Additional Background

¶ 17    At trial, as discussed above, Hicks testified that he was eating dinner in the kitchen when the victim approached him with a knife and violently grabbed his head. To defend himself, he started "jabbing and poking" at the victim with the knife he had been using to eat. On direct examination, Hicks testified about his fear of injury and the possibility that the victim had in fact cut him:

> [DEFENSE COUNSEL:] Why did you feel like you needed to defend yourself? What were you afraid of?

7

[HICKS:] He was going to stab me. And based on the earlier incident that we had during the day, I would have got stabbed.

[DEFENSE COUNSEL:] So in your mind, you believed that he was going to stab you?

[HICKS:] He was, yeah.

[DEFENSE COUNSEL:] Now, is it possible he may have cut you in some way or cut your clothing?

[HICKS:] He might have briefly made an attempt to stab me, and he might have made contact, and, sure, he might have got me,[2] but I was a good bit quicker than he was, and he — it was — it was nothing near the extent of what ended up happening to him.

On cross-examination, Hicks confirmed that he "believed [the victim] was going to stab [him]" and that he believed he was "going to be seriously injured" or "possibly killed."

¶ 18    Hicks tendered instructions that would have informed the jury that he was justified in using deadly force not only if he reasonably believed he was in imminent danger of being killed or of receiving great bodily injury, § 18-1-704(2)(a), but also if the victim reasonably appeared poised to commit first or second degree

_____

[2] Hicks later testified that the victim did not injure him in any way with the knife.

assault, § 18-1-704(2)(c). He also tendered instructions setting forth the elements of first and second degree assault.

¶ 19     His proposed first degree assault instruction tracked the language of section 18-3-202(1)(a) and would have informed the jury that a person commits first degree assault if, with intent to cause serious bodily injury to another person, he causes serious bodily injury to any person by means of a deadly weapon. His proposed second degree assault instruction tracked the language of section 18-3-203(1)(d) and would have informed the jury that a person commits "assault in the second degree (reckless)" if the person "recklessly caused serious bodily injury to another person, by means of a deadly weapon." He also tendered an instruction containing the definition of "serious bodily injury."

¶ 20     At the jury instruction conference, the prosecutor argued that, because "the testimony that we have is that [Hicks] was in fear for his life or essentially receiving great bodily injury," it was sufficient under the facts of this case to instruct the jury that he was entitled to use deadly force if he reasonably believed he was in imminent danger of being killed or of receiving great bodily injury. The court agreed that it should include only those instructions that "are

9

factually supported by the evidence," and it declined to give Hicks's tendered instructions regarding first and second degree assault. Because the definition of "serious bodily injury" was contained in an instruction listing definitions relevant to first and second degree assault, this definition was also not provided to the jury.

¶ 21     Ultimately, the jury was instructed as follows:

> The defendant was legally authorized to use deadly physical force upon another person without first retreating if:
>
> 1. he used that deadly physical force in order to defend himself from what he reasonably believed to be the use or imminent use of unlawful physical force by that other person, and
>
> 2. he reasonably believed a lesser degree of force was inadequate, and
>
> 3. he had a reasonable ground to believe, and did believe, that he was in imminent danger of being killed or of receiving great bodily injury.

### D.     Second Degree Assault

¶ 22     Hicks argues that the district court erred by refusing to instruct the jury that he was justified in using deadly force if the victim reasonably appeared about to commit second degree assault. *See* § 18-1-704(2)(c).  Specifically, he argues that a person may

commit second degree assault intending to cause only bodily injury, not serious bodily injury, *see* § 18-3-203(1)(b), and that "[t]he jury could have believed that it was unreasonable for Mr. Hicks to believe that [the victim] would cause him serious or great bodily injury, but they could have believed that it was reasonable for Mr. Hicks to believe that [the victim] . . . might cause him pain." Relying on *Kaufman v. People*, 202 P.3d 542 (Colo. 2009), he argues that the district court's failure to instruct the jury that he was justified in using deadly force if he "reasonably believed that [the victim] intended to cause [him] *bodily injury*" lessened the prosecution's burden of disproving his affirmative defense of self-defense.

¶ 23     Assuming, without deciding, that this issue was preserved and that the district court erred by failing to instruct the jury on bodily

11

injury, thereby lessening the prosecution's burden of proof,[3] we conclude that any error was harmless beyond a reasonable doubt.

¶ 24    Even if we assume Hicks acted in self-defense, the evidence is overwhelming that Hicks did not act with a reasonable degree of force. *See Bartley v. People*, 817 P.2d 1029, 1034 (Colo. 1991) ("A constitutional error is harmless when the evidence properly received against a defendant is so overwhelming that the constitutional violation was harmless beyond a reasonable doubt."). While Hicks claimed that he "wasn't trying to cause [the victim] harm" and that he stabbed the victim for only "a couple seconds," he inflicted eleven stab wounds on the victim, spread all over the victim's body. And while Hicks claimed to have stabbed the victim in response to the victim approaching him with a knife, the victim had no apparent defensive injuries and Hicks had no knife injuries from the victim.

---

[3] Contrary to Hicks's argument on appeal, his tendered instruction did not inform the jury that "a person may commit second degree assault intending to cause only bodily injury." Instead, his tendered instruction informed the jury that a person commits second degree assault (reckless) by causing "serious bodily injury." This is because his tendered instruction did not come from section 18-3-203(1)(b), C.R.S. 2024 (describing an "intent to cause bodily injury"), but instead came from section 18-3-203(1)(d) (describing recklessly causing "serious bodily injury").

In fact, Hicks appeared unable to recreate the physical movements that could have caused the eleven stab wounds. Thus, even if the jury believed there was a reasonable doubt as to whether Hicks acted in self-defense, there was overwhelming evidence that he did not act with a reasonable degree of force when he stabbed the victim eleven times. *See* § 18-1-704(2).

¶ 25    Additionally, the evidence is overwhelming that, contrary to Hicks's testimony, the fatal wound was inflicted with a knife in the bedroom. While Hicks claimed he stabbed the victim in the kitchen and severed his artery there, the tested blood in the kitchen was Hicks's own, not the victim's.[4] And while Hicks claimed that the victim walked from the kitchen into the bedroom after Hicks stabbed him and that Hicks talked to the victim through the bedroom door for at least fifteen minutes, the pathologist testified that the wound to the victim's left iliac artery would have rendered him unconscious within seconds or a few minutes. Further, there was only one knife found in the bedroom. While Hicks claimed that the knife found in the victim's bedroom was the one the victim used

---

[4] Hicks testified that he cut himself on the knife he used to stab the victim.

to attack him and that he never touched it, eighty-eight percent of the DNA on the handle of that knife belonged to Hicks.  Since Hicks never testified that the victim attacked him in the bedroom, the infliction of the fatal wound there undermines his claim of self-defense.

¶ 26     Following *Kaufman*, we continue to narrowly focus on the particular facts of Hicks's self-defense claim to determine whether the conviction here was influenced by the district court's failure to instruct the jury that Hicks was justified in using deadly force if he reasonably believed the victim intended to cause him only bodily injury.  In *Kaufman*, the supreme court held that the district court plainly erred by erroneously instructing the jury that second degree assault required an intent to cause serious bodily injury rather than merely bodily injury.  202 P.3d at 549.  At trial, there was conflicting testimony regarding whether the victim had his arms in the air as he approached the defendant or whether he reached behind his back as he approached, leading the defendant to believe he was reaching for a weapon.  *Id.* at 547.  After analyzing the testimony in detail, including testimony regarding the victim's physical size, intoxication, and use of an antisemitic slur, the

supreme court concluded that "the evidence may have supported a jury finding of intent to cause [only] bodily injury." *Id.* at 550. Because the jury was precluded from considering "whether [the defendant's] actions were justified if he reasonably believed that [the victim] only intended to cause him *bodily injury* (i.e., physical pain)," the instructional error could have prevented the jury from accepting the defendant's claim of self-defense, and reversal was required under the plain error standard. *Id.* at 549.

¶ 27 This case, in contrast, did not turn on Hicks's perception of whether the victim *intended* to cause him bodily injury with a knife or serious bodily injury, whether with a knife or by any other means. Rather, it turned on whether or not the jury believed that the victim attacked Hicks with a knife *at all.* As Hicks put it, the "central dispute was whether (as Mr. Hicks testified) [the victim] came out of his room with a knife and tried to attack Mr. Hicks as he was eating, or whether (according to the People's theory) [the victim] never left his room but instead was attacked there by Hicks." If the jury believed that the victim attacked Hicks with a knife, then the risk of serious bodily injury was obvious — as Hicks himself repeatedly testified, he believed he was going to be stabbed

and was "going to be seriously injured" or "possibly killed."[5] Because the only self-defense theory offered at trial was that the victim attacked Hicks with a knife, causing him to fear being killed or seriously injured, the jury had no basis to believe that Hicks feared only bodily injury but not serious bodily injury.

¶ 28 While a slight possibility may exist that the jury could have believed that (1) Hicks used a reasonable degree of force; (2) the fatal wound was not inflicted in the bedroom, or the victim attacked Hicks in the bedroom; or (3) Hicks had a reasonable fear of bodily injury from a knife but not serious bodily injury, the likelihood of the jury having a reasonable doubt as to all of these propositions is so remote that we conclude there is no reasonable possibility that any error might have contributed to the conviction. Thus, the court's failure to instruct on fear of bodily injury as a defense was harmless beyond a reasonable doubt.

---

[5] Although Hicks argues in his reply brief that his testimony reflected merely "a fear of being injured in general," he acknowledges several times in his opening brief that he testified he was afraid specifically of being stabbed, noting that "Mr. Hicks testified he was afraid that [the victim] would stab him" and "Mr. Hicks feared that [the victim] would stab him."

## E.    Definition of "Great Bodily Injury"

¶ 29    Next, Hicks argues that, because the jury was instructed that self-defense required a belief "that he was in imminent danger of being killed or of receiving great bodily injury," the district court erred by failing to provide a definition of "great bodily injury." Because "great bodily injury" and "serious bodily injury" mean the same thing, *Reed*, 695 P.2d at 808, he argues that the court should have provided the definition of serious bodily injury set forth in section 18-1-901(3)(p), C.R.S. 2022.  We conclude that any error was harmless beyond a reasonable doubt.

¶ 30    In general, "[w]hen the legislature includes particular definitions for terms it uses in a statute, those definitions, not an average person's understanding of the terms, govern." *People v. Rigsby*, 2020 CO 74, ¶ 24.  In this case, however, the precise definition of great or serious bodily injury was never implicated.  If the jury believed Hicks's testimony, then it was clear that he had a reasonable fear of being stabbed or killed.  But if the jury accepted the prosecution's version of events — that Hicks attacked the victim in his bedroom and never faced any danger — then the definition of great or serious bodily injury was irrelevant.  In either case, there is

no reasonable possibility that the lack of the definition might have contributed to Hicks's conviction.

¶ 31    Indeed, any error in failing to define great or serious bodily injury would have inured to Hicks's benefit.  The jury received an instruction in connection with the third degree assault charge defining "bodily injury" as "physical pain, illness, or any impairment of physical or mental condition."  Without a definition of great or serious bodily injury, the jury would reasonably have relied on that definition to discern the meaning of "great bodily injury."  Thus, the alleged instructional error could only have benefited Hicks because the jury would likely have interpreted "great bodily injury" to mean simply "great physical pain," thereby raising the prosecution's burden by allowing Hicks to use deadly force if he was in reasonable fear of "great physical pain" as opposed to "a substantial risk of death, a substantial risk of serious permanent disfigurement, a substantial risk of protracted loss or impairment of the function of any part or organ of the body, or breaks, fractures, or burns of the second or third degree."  § 18-1-901(3)(p), C.R.S. 2022.

¶ 32    We thus conclude that no reversible instructional error occurred.

## III.    Evidentiary Ruling

¶ 33    Hicks contends that the district court erred by limiting his questioning of a detective who helped process the crime scene.  We again disagree.

### A.    Standard of Review

¶ 34    The district court has broad discretion in determining the admissibility of evidence based on its relevance, probative value, and prejudicial impact.  *People v. Elmarr*, 2015 CO 53, ¶ 20.  This includes the discretion to rule on the admissibility of expert testimony.  *Kutzly v. People*, 2019 CO 55, ¶ 8.  We review these evidentiary rulings for an abuse of discretion.  *People v. Quillen*, 2023 COA 22M, ¶ 14.  The district court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or unfair, or if the court misapplies the law.  *Id.*

### B.    Governing Law

¶ 35    Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without

the evidence." CRE 401. Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. CRE 403. Evidence that is not relevant is not admissible. CRE 402.

¶ 36 "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." CRE 702. Expert testimony "is that which goes beyond the realm of common experience and requires experience, skills, or knowledge that the ordinary person would not have." *Venalonzo v. People*, 2017 CO 9, ¶ 22. To determine whether expert testimony is admissible under CRE 702, the court must determine, among other things, the "qualifications of the witness." *People v. Shreck*, 22 P.3d 68, 70 (Colo. 2001).

## C. Additional Background

¶ 37 A detective who helped process the crime scene was asked by her supervisor "to conduct a walk-through of the apartment in relation to blood pattern analysis." In a report of her findings, she

wrote that there was blood "consistent with an arterial spurt stain" on the dishwasher in the kitchen. According to her report,

- such a stain "is created when blood is ejected in a stream under pressure, often occurring when an artery or the heart is breached, and the circulatory system is still under pressure";

- "[i]t is known from the autopsy report that [the victim] received a stab wound . . . to the left internal iliac artery and left iliac vein"; and

- "[t]he stain patterns in the kitchen would be indicative of this injury being created in the kitchen."

However, this initial analysis was later disproven by DNA testing that showed it was not the victim's blood on the dishwasher — rather, it was Hicks's blood. Hicks testified that he accidentally cut himself.

¶ 38 Hicks first sought to have the detective testify to the conclusions in her report "to corroborate his testimony that the confrontation with [the victim] occurred in the kitchen." But the district court determined that the detective was not qualified as a blood spatter expert and that there was "little to no . . . content in

[her] report which could be elicited" that was outside the scope of expert testimony. Hicks did not challenge the court's ruling that the detective was not qualified to give expert testimony, but he argued that she could still testify "[t]hat she was asked to do a walk-through in relation to blood pattern analysis"; "that she walked around and she looked at different locations . . . where there was blood located"; and "that there can be pertinent or helpful information gained from looking at the different blood patterns."

¶ 39    The prosecutor objected to this testimony on two grounds. First, it was cumulative, because another detective had already testified that the police look for blood at a crime scene in order to figure out what happened. And second, it risked confusing the jury, because

> the second that we put a detective on the stand to testify about going in there to look at blood pattern[s], this jury, based on the questions that they just asked related to this last witness, is going to have 150,000 questions about what those patterns mean and what they told her and what she was able to determine from them, and she's not qualified to provide that testimony. And then the jury is going to be wondering, even though they're instructed not to, well, why aren't these questions being answered.

22

The district court sustained the objection and ruled that "there will not be testimony on this issue presented by [the detective]."

### D. Discussion

¶ 40     Hicks argues that the district court erred by not permitting the detective to testify that she walked through the apartment "in relation to blood pattern analysis" and that law enforcement can gain "helpful information . . . from looking at the different blood patterns." Although he insists that he "was not seeking to elicit an expert opinion," he argues that the detective's testimony was "pivotal" to the "central dispute" regarding whether the victim attacked Hicks in the kitchen or Hicks attacked the victim in his bedroom.

¶ 41     Hicks does not explain how the detective's testimony about gaining information from blood patterns could have supported his account that he stabbed the victim in the kitchen without straying into the realm of expert testimony. Nor does he explain how the detective's testimony could have supported his account of the incident given that the blood on the dishwasher was not from the victim. Further, we agree with the district court that the detective's testimony would have been cumulative, as another detective who

23

helped process the crime scene testified about the bloodstains in the apartment and the fact that the police looked for blood in "various locations to sort of help tell the story of where people were moving around." We thus discern no abuse of discretion in the court's ruling limiting the detective's testimony. *See Elmarr*, ¶ 20.

¶ 42 We are not persuaded otherwise by Hicks's alternative argument that the detective's testimony was necessary to allow him "to point out to the jury that law enforcement could have done further investigation and testing of the [blood] evidence" but did not do so. On the contrary, another detective testified that, although she could have had the "bloodstains and patterns analyzed by an expert to determine how they potentially may have been deposited," she chose not to "send any sort of photographs or information to have a blood spatter expert analyze these blood stains." Hicks was thus able to elicit that law enforcement could have ordered expert blood spatter analysis but elected not to. And during closing argument, defense counsel discussed the alleged deficiencies in the investigation and emphasized the potential evidence that was not collected or presented, including blood spatter analysis. *See People v. Brown*, 2014 COA 155M-2, ¶ 16 (concluding that no

24

reversible error occurred where the defendant "was able to present to the jury most of the evidence underlying his contention that the police investigation was deficient and to argue the purported inadequacy in closing").

## IV. *Miranda* Violation

¶ 43 Last, Hicks argues that, because he was never given a *Miranda* advisement, the district court should not have allowed testimony regarding (1) his demeanor while in police custody; (2) statements he made about the fistfight; and (3) the fact that he did not initially say that he had acted in self-defense. We begin by describing the governing law and standard of review, then turn to Hicks's arguments.

### A. Governing Law and Standard of Review

¶ 44 Before conducting a custodial interrogation, officers must give a suspect a *Miranda* advisement to inform him of his constitutional rights to remain silent and request an attorney. *Miranda*, 384 U.S. at 444. Statements made during a custodial interrogation are admissible in the prosecution's case-in-chief only if they were preceded by a *Miranda* advisement (unless the suspect voluntarily,

knowingly, and intelligently waived his rights, an issue not relevant to this appeal). *See Sanchez v. People*, 2014 CO 56, ¶ 11.

¶ 45     In reviewing a district court's ruling on a motion to suppress, we defer to the court's factual findings if they are supported by the record and review the court's application of law de novo. *See People v. Sampson*, 2017 CO 100, ¶ 16. When a defendant raises *Miranda* contentions on appeal that he did not raise before the district court, we review those contentions for plain error. *Phillips v. People*, 2019 CO 72, ¶ 38. Plain error is an error that is obvious and substantial. *Hagos*, ¶ 14. An error is "obvious" if the challenged action contravened a clear statutory command, a well-settled legal principle, or Colorado case law. *People v. Thompson*, 2018 COA 83, ¶ 34, *aff'd*, 2020 CO 72. An error is "substantial" if it so undermined the fundamental fairness of the trial itself as to cast doubt on the reliability of the judgment of conviction. *Hagos*, ¶ 14.

### B.     Testimony Regarding Hicks's Demeanor

¶ 46     Hicks argues for the first time on appeal that the district court should not have permitted two officers who spoke with him while he was handcuffed in the hallway outside his apartment to testify

about his demeanor. Specifically, he argues that the officers should not have been allowed to testify that (1) "when we would ask some questions, [Hicks] would almost seem like he was about to cry at certain points"; and (2) Hicks became "belligerent" and "combative" when asked questions. Because this argument is unpreserved, we review for plain error.

¶ 47    Hicks provides no authority, nor are we aware of any, for the proposition that "*Miranda* required the court to suppress [the officers'] descriptions of Hicks's demeanor when he was asked questions." Contrary to Hicks's argument, *Miranda* applies to a suspect's *statements*, not to officers' observations of the suspect. *See People v. T.C.*, 898 P.2d 20, 25 (Colo. 1995) ("The remedy for a *Miranda* violation . . . is suppression of the statements obtained."). Given the lack of authority to support Hicks's position, we conclude that any error in the district court's failure to suppress the officers' testimony regarding his demeanor was not obvious. *See Thompson*, ¶ 34.

¶ 48    To the extent Hicks argues that his demeanor was an expressive statement, he does not develop that argument. We

therefore decline to address it.  *See People v. Stone*, 2021 COA 104,

¶ 52 (appellate courts do not address undeveloped arguments).

### C.    Statements About Fistfight

¶ 49    Second, Hicks argues that the district court should not have permitted an officer who spoke with him while he was handcuffed to testify regarding the fistfight earlier that day between Hicks and the victim.  Specifically, the officer had the following colloquy with the prosecutor:

> [PROSECUTOR:] At any point did Mr. Hicks make a statement referencing the prior incident?
>
> [OFFICER:] Yes.
>
> [PROSECUTOR:] And what was the statement that Mr. Hicks made to you?
>
> [OFFICER:] He said that they were arguing a little bit earlier, and then — excuse my language — that a little bitch was acting like a little bitch.
>
> [PROSECUTOR:] Did Mr. [Hicks] also indicate, no, there was no prior incident?
>
> [OFFICER:] He did, yes.
>
> [PROSECUTOR:] Did he indicate who he was referring to when he mentioned the little bitch?
>
> [OFFICER:] No.

¶ 50 The officer did not testify that Hicks made these statements in response to a question. Rather, Hicks's statements appear to have been spontaneous and voluntary. Spontaneous and voluntary statements are not subject to suppression. *See People v. White*, 632 P.2d 609, 612 (Colo. App. 1981) ("spontaneous and voluntary utterances" did not need to be suppressed even though the defendant had not been given *Miranda* warnings before he made the statements). We thus discern no error in their admission.

### D. No Initial Mention of Self-Defense

¶ 51 Third, Hicks argues, without citation to the record, that "[b]ecause *Miranda* warnings were never given," "the officers [should not] have been allowed to testify that Mr. Hicks did not state he was acting in self-defense." Parties "should not 'expect the court to peruse the record without the help of pinpoint citations.'" *O'Quinn v. Baca*, 250 P.3d 629, 632 (Colo. App. 2010) (citations omitted). Nevertheless, we believe Hicks is referring to the following exchange between the prosecutor and one of the officers who responded to his 911 call:

> [PROSECUTOR:] Did he ever indicate to you
> that he was just defending himself?

[OFFICER:] No.

¶ 52　Hicks does not develop his argument to explain why this testimony is inadmissible and should have been suppressed.  We therefore do not address it.  *See Stone*, ¶ 52.

## V.　Disposition

¶ 53　The judgment is affirmed.

JUDGE HARRIS and JUSTICE MARTINEZ concur.